UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **14-20310CR-LENARD**

18 U.S.C. § 371
18 U.S.C. § 982

/GOODMAN

UNITED STATES OF AMERICA

vs.

**EURIDICE BORROTO,**

        **Defendant.**
_____/

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Information:

#### The Medicare Program

1. The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were 65 or older, or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

3. "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required

home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4. Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries, were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and identification number of the physician or other health care provider who ordered the services.

5. CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims. As administrator, Palmetto was to receive, adjudicate and pay claims submitted by HHA providers under the Part A program for home health claims.

## Part A Coverage and Regulations

### Reimbursements

6. The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits. A patient qualified for home health benefits only if:

   a. the patient was confined to the home, also referred to as homebound;

 b. the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

 c. the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

 7. HHAs were reimbursed under the Home Health Prospective Payment System ("PPS"). Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care." The base payment was adjusted based on the health condition and care needs of the beneficiary. This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition. If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

 8. In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier

Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

### Record Keeping Requirements

9. Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10. Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home health services, and an OASIS.

11. Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and

the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

### Special Outlier Provision

12. Medicare regulations allowed certified home health agencies to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified home health agency. That certified home health agency would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees. However, Medicare regulations prohibit one home health agency merely serving as a billing mechanism for another agency.

13. For insulin-dependent diabetic beneficiaries, Medicare paid for insulin injections by an HHA when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary. Additionally, for beneficiaries for whom occupational or physical therapy was medically necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14. While payment for each episode of care was adjusted to reflect the beneficiary's

health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries who had the most extensive care needs, which may result in an Outlier Payment to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

### The Defendant and Related Entities

15. Defendant **EURIDICE BORROTO** was a resident of Miami-Dade County, Florida.

16. Nestor's Health Services, Inc. ("Nestor HH") was a Florida corporation incorporated in or around January 6, 2006, that did business in Miami-Dade County, Florida as a HHA that purported to provide home health services. Nestor HH had a principal address of 12460 SW 8th Street, Suite 201, Miami, Florida, 33184.

### COUNT 1
### Conspiracy to Defraud the United States and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1. Paragraphs 1 through 16 of the General Allegations section of this Information are realleged and incorporated by reference as though fully set forth herein.

2. From in or around January 2012, and continuing through in or around December 2012, the exact dates being unknown to the United States Attorney, at Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**EURIDICE BORROTO,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly

combine, conspire, confederate and agree with others known and unknown to the United States Attorney, to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program; and to commit certain offenses against the United States, that is: To violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including any kickback and bribe, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

## PURPOSE OF THE CONSPIRACY

3. It was the purpose of the conspiracy for the defendant and her co-conspirators to unlawfully enrich themselves by: (1) soliciting and receiving kickbacks and bribes for referring Medicare beneficiaries to Nestor HH so that their Medicare beneficiary numbers would serve as the bases of claims filed for home health care; and (2) submitting and causing the submission of claims to Medicare for home health services that the co-conspirators purported to provide to those beneficiaries.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and her co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4. **EURIDICE BORROTO** solicited and received kickbacks from co-conspirators at Nestor HH in exchange for referring Medicare beneficiaries to Nestor HH for purported home health services.

5.     **EURIDICE BORROTO** caused Nestor HH to submit claims to Medicare for home health services purportedly rendered to the recruited Medicare beneficiaries.

6.     **EURIDICE BORROTO** caused monies to be paid by Medicare to Nestor HH based upon the claims for home health services purportedly rendered to the recruited Medicare beneficiaries.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.     On or about November 27, 2012, **EURIDICE BORROTO** received a cash payment in the approximate amount of $5,400 from the owner and operator of Nestor HH.

2.     On or about December 17, 2012, **EURIDICE BORROTO** received a cash payment in the approximate amount of $3,500 from the owner and operator of Nestor HH.

All in violation of Title 18, United States Code, Section 371.

## CRIMINAL FORFEITURE
### (18 U.S.C. § 982)

1.     The allegations contained in this Information are re-alleged and incorporated by reference as though fully set forth herein for the purposes of alleging forfeiture to the United States of America of certain property in which the defendant **EURIDICE BORROTO** has an interest.

2.     Upon conviction of the offense charged in this Information, the defendant shall forfeit to the United States all of her right, title and interest in property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3. The property subject to forfeiture includes but is not limited to approximately $170,000 in United States currency, which sum represents the approximate gross proceeds of the charged offenses.

4. If any of the property described above, as a result of any act or omission of the defendant:

>   a. cannot be located upon the exercise of due diligence;
>
>   b. has been transferred or sold to, or deposited with, a third party;
>
>   c. has been placed beyond the jurisdiction of the court;
>
>   d. has been substantially diminished in value; or
>
>   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(I).

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____ /for
GEJAA GOBENA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
ANNE P. MCNAMARA
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|
| vs. | |
| EURIDICE BORROTO, | **CERTIFICATE OF TRIAL ATTORNEY*** |
| **Defendant.** _____ / | **Superseding Case Information:** |

**Court Division:** (Select One)

| | | | | |
|---|---|---|---|---|
| _X_ Miami | ___ Key West | | New Defendant(s) | Yes ___ No ___ |
| ___ FTL | ___ WPB | ___ FTP | Number of New Defendants | ___ |
| | | | Total number of counts | ___ |

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:     (Yes or No)      _Yes_
   List language and/or dialect     _Spanish_

4. This case will take ___0___ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)

   | I   | 0 to 5 days      | _X_ | Petty   | ___ |
   |-----|------------------|-----|---------|-----|
   | II  | 6 to 10 days     | ___ | Minor   | ___ |
   | II  | 11 to 20 days    | ___ | Misdem. | ___ |
   | IV  | 21 to 60 days    | ___ | Felony  | _X_ |
   | V:  | 61 days and over | | | |

6. Has this case been previously filed in this District Court?   (Yes or No)   No   _No_
   If yes:
   Judge: _____   Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?   (Yes or No)   _No_
   If yes:
   Magistrate Case No.
   Related Miscellaneous numbers:
   Defendant(s) in federal custody as of
   Defendant(s) in state custody as of
   Rule 20 from the _____   District of _____

   Is this a potential death penalty case? (Yes or No)   _No_

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    ___ Yes   _X_ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    ___ Yes   _X_ No

_____
ANNE P. McNAMARA
DOJ TRIAL ATTORNEY
Court No. A5501847

*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   Euridice Borroto

**Case No:** _____

Count #:   1

18 U.S.C. § 371

Conspiracy to Defraud the United States and Receive Healthcare Kickbacks

**\*Max Penalty**:   Five (5) years' imprisonment

Count #:

_____

**\*Max Penalty**:

Count #:

_____

\*Max Penalty:

Count #:

_____

\*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: _____

### BOND RECOMMENDATION

DEFENDANT: EURIDICE BORROTO

$100,000 10%; Nebbia condition
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA:   Anne P. McNamara, DOJ

Last Known Address: _____

_____

_____

What Facility:   12020 Miramar Parkway

Miramar, FL

Agent(s):   HHS/OIG Alberico Crespo
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)